Filed 9/5/13  In re Tyler G. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re TYLER G., a Person Coming Under the Juvenile Court Law. | B247249<br>(Los Angeles County<br>Super. Ct. No. CK30123) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ROBIN G.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Donna Levin, Referee.  Dismissed.

Robin G., in pro. per.; and Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

Robin G. (Mother) appeals from the dependency court's jurisdictional and dispositional order removing her newborn son Tyler from her care. We appointed counsel for Mother, and counsel filed an opening brief informing us she was unable to find any arguable issues, and requesting that we exercise our discretion to permit mother personally to submit a supplemental brief. On June 25, 2013, Mother filed a supplemental brief. Neither Mother's brief, nor our independent review of the record, reveals any arguable issues. Accordingly, we dismiss the appeal.

## BACKGROUND

In August 1997, Mother gave birth to her daughter Amanda G. at a McDonald's and Mother and the baby were hospitalized at the Kaiser Permanente Hospital on Sunset Boulevard for two days. Mother left without the baby and Department of Children and Family Services (DCFS) was unable to locate Mother. Mother never contacted DCFS and the case terminated in April 2000 when Amanda was adopted. In 1998, DCFS located Mother, who told them she left home at 18 due to physical and sexual abuse by her father and brother. Mother used cocaine and worked as a prostitute.

On August 30, 2012, DCFS received a referral regarding Tyler, who was born one month prematurely on August 20, 2012. Mother initially had difficulty bonding with Tyler and properly feeding him. However, when discharged from the hospital, she demonstrated the ability to properly care for him. However, the hospital had to issue mother a car seat, baby clothes, diapers and formula. Mother had limited supplies and did not appear able to acquire more.

Mother's pediatrician at the hospital told the social worker that Mother "seemed a little off." He explained that because Tyler was not feeding well, the hospital told Mother he would need to stay for a few days. At first, Mother seemed to understand, but five minutes later, Mother was upset and wondered why she and the baby could not go home. Mother stated she had no family or friends.

On August 31, 2012, the social worker went to Mother's room at a residence hotel and spoke to Robert Collins, the maintenance man. He told the social worker Mother had

2

lived at the hotel for about a year, and he did not see any visitors at Mother's room. Collins was concerned about Tyler because of the way Mother handled him and put him in the car seat. "She handles him like he is a toy. He is in his little carrier and she is rough with him. She swings [the car seat] around like there is no baby inside it. I have seen this . . . three or four times since she brought the baby home." Collins suspected that Mother had "split personalities." "Mother would be fine one minute and be friendly, within minutes she [would] get[] upset and start[] yelling or talking to herself." Mother would answer herself, stop in the hallway and talk to the wall or empty space.

Christine Directo, the property manager of Mother's residence hotel told the social worker that Mother would be evicted on September 9, 2012. She had seen Mother swinging the baby carrier around and was "happy to see the baby [was] still alive." She believed Mother was unstable, but did not suspect substance abuse. Mother would talk to her and suddenly turn to her side and start talking to someone who was not there. Mother got upset easily and changed her tone, and Mother would forget information from one minute to the next. Dave Ellis, the desk clerk, resided a few doors away from Mother's unit and heard her screaming "[s]hut up, [s]hut up" at 1:00 a.m. He heard Tyler crying at night and Mother screaming at him. Ellis also observed Mother speaking to herself and swinging the baby carrier roughly.

The nurse at the hospital where Tyler was born told the social worker that she had seen Mother and Tyler when he came in for his newborn check up. Tyler seemed fine, and there were no concerns with Mother's behavior. Mother had a lot of questions and concerns about how to care for Tyler. However, the nurse only saw them for about five minutes.

The social worker and two police officers visited Mother's room. Mother invited them in. The residence was dark and Mother stated the light fixtures did not work. The blinds were closed and had a sheet over them. The room had a twin size mattress and several puddles of water on the floor. The mattress was filthy and had no linen. On a small table were approximately 20 bottles of champagne, beer, and alcohol. Some were

3

open and empty or half full.  A small refrigerator contained two water bottles, rotten broken eggs, and one empty can of baby formula.  The refrigerator was filthy and had living and dead cockroaches inside.  The entire apartment had cockroaches crawling all over.  Mother stated she had an infestation of cockroaches and bedbugs.  The baby items included the car seat/carrier, one plastic laundry basked and about 10 newborn outfits, four small prefilled baby bottles, one small bag of diapers, travel size baby shampoo, and a small bag of baby wipes.  The baby items had cockroaches all over.  There were two large windows with no safety gates or screens.

Mother stated she was moving due to the conditions of the apartment.  Mother told the social worker that Tyler was premature, and that she did not obtain prenatal care.  Mother had been diagnosed with esophageal cancer prior to her pregnancy, and although she followed her medical treatment for cancer, she did not obtain any prenatal care.  Mother stated her cancer causes a lot of pain and she vomits.  Mother had tumors but did not get to the doctor often because the doctor's office was too far away.  Mother took medication for her tumors but had not refilled the medication in over a year.  Mother fed Tyler one small bottle ever three hours and changed his diaper four or five times a day.  Mother insisted there was formula in the refrigerator although there was none.  When asked about Tyler's father, Mother began to cry and stated she did not want to discuss him.  Mother did not have any family or friends to assist her.

Mother intended to move and return to school for the fall semester to study to become a radiology technician.  She also had a small business on the side selling health and wellbeing products.  Mother planned to move to Kentucky where her maternal grandmother resides.  Mother denied any history of mental illness or hallucinations.  She stated that when she seemed to be talking to herself, she was actually talking on the phone.  Mother denied yelling at Tyler, or handling him roughly.  Mother stated she did not have any other children, and once had a stillborn baby.  When confronted with her 1997 case, Mother stated, "Oh, you mean Amanda?"  Mother stated Amanda was born on

the streets and was taken by DCFS. Mother was never told how she could get Amanda back.

When informed that DCFS intended to detain Tyler, Mother was calm and asked several appropriate questions. She stated Tyler's father used drugs, but they were legal drugs, and he had been violent with her on the phone. She did not know where he lived but gave the social worker a phone number for Carlos G. Tyler was detained.

DCFS contacted Carlos G., who told them he has known Mother for 20 years. He met Mother on the street; Mother works the streets of Hollywood and asks him for money several times a year. Mother has a 16-year-old son residing in Mississippi with family. Carlos G. did not deny he had sex with Mother, but stated it was about eight months ago. He has seen track marks on Mother's arms and Mother smelled to him like she used methamphetamine. Carlos G. believed Mother had some mental health problems but he was not sure. About four months ago, Mother asked for $1,000 to move to Kentucky. When he refused, she said she would report him to the police for soliciting, and informed him she was expecting his baby. He does not believe he is Tyler's father.

Mother admitted to the social worker she had a 16-year-old son named Jonathan who lived in Kentucky. DCFS learned that Mother was arrested in August 1997 for soliciting in Los Angeles.

DCFS filed a petition dated September 6, 2012, alleging failure to protect under Welfare and Institutions Code section 300, subdivision (b), based on Mother's mental and emotional problems, and the unsanitary condition of Mother's home.

At the September 6, 2012 detention hearing, the court found Carlos G. to be Tyler's alleged father. Mother stated she was moving in two days and wanted Tyler returned to her at that time. The court ordered Tyler detained and placed in foster care, and granted Mother visitation three times a week, for three hours per visit.

DCFS's jurisdiction report stated that Carlos G. denied paternity and was requesting a DNA test. Carlos G. was in a relationship and did not want to be involved

with Tyler. Tyler's caregiver had reported that often Mother's phone did not work or there was difficulty contacting Mother.

The desk clerk informed DCFS that Mother had left the hotel about a week before. He said Mother often talked to herself and yelled. What Mother said often did not make any sense. Mother did not treat Tyler well. The maintenance man, reiterated that Mother talked to herself and handled Tyler very roughly. Sometimes Mother was pleasant, but other times she would be "ranting and raving about how she was being treated in her job."

Directo, the property manager, told DCFS that Mother was evicted because she did not pay her rent. Directo disputed that there were power problems, and stated the hotel sprayed for bugs. Mother called the health department but then Mother refused to let them spray.

Mother's visitation with Tyler was haphazard. She missed the first visit, informing the social worker she woke up late. Mother was tardy to the second visit because she could not find the location. Mother's interaction with Tyler was appropriate. Mother was tardy to the third visit but interacted appropriately with Tyler. Mother was not well groomed, and the foster mother reported that Mother kept repeating that she should not be going through this, it was retaliation, and she would do anything to get her baby back. Mother did not show for the fourth visit, nor did she call to cancel. Mother called the foster mother and apologized, but then stated there were delays with getting a bus. For the fifth scheduled visit, Mother called and canceled. Mother called the foster mother and yelled at her.

On September 10, 2012, the social worker visited Mother's new residence. The apartment was a single unit that appeared clean. There was a strong smell of cigarettes. Mother shared a toilet and shower, and the room had a bed and dresser. A small refrigerator was clean but empty. Mother had baby bottles, travel size baby toiletries, and baby clothing. The bottles were dusty and appeared to have roach feces on them. Mother agreed the bottles would need to be cleaned prior to use.

6

DCFS recommended that no reunification services be provided pursuant to Welfare and Institutions Code section 361.5, subdivision (b) (10) and (11).

At the September 24, 2012 hearing, the court took evidence from the social worker regarding the conditions of Mother's room at the residence hotel at the time of detention, the statements of the staff at the residence hotel, Mother's new residence, and her discussions with the pediatrician at the hospital regarding Mother and Tyler. The social worker did not recall seeing a crib in Mother's new residence. Mother testified that she complained to the residence hotel about the lack of working lights or heat, the insect infestation, and that she had filed complaints with the housing and health departments, and that she had won her case against the hotel. She agreed to move out to seek federal housing assistance. Mother asserted she had a crib in her new residence. Mother claimed that she did not receive notice of the proceedings with respect to Amanda.

The dependency court sustained the allegations of the petition and denied reunification services.

We appointed appellate counsel to represent Mother. On June 6, 2013, Mother's counsel filed an opening brief, pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835 and *In re Sade C*. (1996) 13 Cal.4th 952, informing us that she had found no arguable issues, and requesting us to exercise our discretion to permit Mother to submit her own brief. On June 7, 2013, we notified Mother that she had 30 days with which to submit a letter or brief stating any contentions or arguments she wished us to consider.

Mother submitted a supplemental brief in pro. per., on June 25, 2013. (*In re Phoenix H*., *supra*, 48 Cal.4th at p. 844.) Mother stated that the case was the result of false allegations of the staff of her residence hotel. She had been in a dispute with management for "years" over the condition of her apartment, and had contacted the Health Department, which inspected the hotel and ordered repairs. After the hotel sued to evict Mother and lost their case, she believed the hotel reported her to DCFS in retaliation. Mother stated she had complied with all court orders and done things beyond

7

what was called for in the court order—Mother voluntarily submitted to a number of tests showing there were no mental issues, drug issues, or anger management issues.

We have reviewed Mother's supplemental brief.  Out of an abundance of caution, we have also independently reviewed the record.  Our review has confirmed what Mother's counsel determined, i.e., nothing in the record indicates that an arguable issue exists for our consideration, and nothing in Mother's supplemental brief changes that result.

## DISPOSITION

The appeal is dismissed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


ROTHSCHILD, J.

8